**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 11-306 |
| PEDRO ALEJANDRO RUBIO-PEREZ, | Judge Beryl A. Howell |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

Pending before the Court is defendant Pedro Alejandro Rubio-Perez's Motion for Compassionate Release ("Def.'s Mot."), ECF No. 154, pursuant to amendments made by the First Step Act of 2018 ("FSA") to federal courts' compassionate release authority, as codified at 18 U.S.C. § 3582(c)(1)(A). *See* Pub. L. No. 115-391, title VI, § 603(b), 132 Stat. 5194, 5239-41. Defendant suffers from "an amalgam of serious and life-threatening conditions" for which he contends the Bureau of Prisons ("BOP") cannot "provide the necessary level of specialized care," in part because defendant speaks only "extremely limited English" and BOP no longer provides interpreters for medical appointments, compounded by the continued risk to his health posed by his post-release detention in the custody of Immigration and Customs Enforcement ("ICE"). Def.'s Mot. at 1; Def.'s Reply in Support of Mot. for Compassionate Release ("Def.'s Reply") at 3, ECF No. 161. He argues that this confluence of circumstances constitutes an "extraordinary and compelling reason[]" for release under the FSA prior to his scheduled July 25, 2026, release date and that early release would be consistent with the factors outlined in 18 U.S.C. § 3553, because he is not being provided access to appropriate medical care due to the lack of interpretation services, will be released into the custody of immigration authorities for deportation, where he is likely to be held for an unknown additional period of time with questionable medical attention,

1

and, due to this immigration detention and his voluntary exit from the drug trade prior to his arrest, would pose no danger to the public upon release.  Def.'s Mot. at 3-4.  The Government opposes early release.  Gov't's Opp'n to Def.'s Mot. for Compassionate Release ("Gov't's Opp'n"), ECF No. 156.  For the reasons discussed, defendant's motion is **GRANTED**.

## I.    BACKGROUND

The offense conduct, based on the statement of facts agreed to by defendant in support of his plea agreement, Statement of Facts ("SOF"), ECF No. 73, along with factual findings from sentencing, is briefly summarized below, followed by discussion of the procedural history of the case and, finally, of the facts relevant to defendant's compassionate release motion.

### A.  Defendant's Crimes

Between 1999 and 2009, defendant participated in a conspiracy with other members of a drug trafficking organization ("DTO") to acquire, manufacture, and transport cocaine and marijuana from Mexico to the United States.  SOF ¶ 3.  For example, the DTO used hidden compartments in tractor trailers to ship hundreds of kilograms of cocaine and several tons of marijuana across the border.  *Id.*  Recorded phone calls captured by the U.S. government showed defendant coordinating these shipments, *id.* ¶ 4, and from at least 2004 to 2006, defendant was a leader in the DTO, Minute Order (Dec. 11, 2018) (announcing factual finding of defendant's leadership after evidentiary hearing for sentencing).  In all, he was directly responsible for the shipment of at least four hundred and fifty kilograms of cocaine and forty-five thousand kilograms (nearly 50 tons) of marijuana into the United States.  SOF ¶¶ 9-10.  Defendant left the conspiracy in 2009, four years prior to his 2013 arrest by Mexican authorities, to lead a law-abiding life, and the government at no point alleged that he participated in any criminal conduct after that.  Gov't's

Mem. in Aid of Sentencing ("Gov't's Sentencing Mem.") at 4, ECF No. 80; Def.'s Mem. in Aid of Sentencing ("Def.'s Sentencing Mem.") at 3, 10, ECF No. 96.

## B. Procedural History

On April 3, 2018, after being extradited to the United States, defendant pled guilty to the indictment's sole count of Conspiring to Distribute Five Kilograms or More of Cocaine and 1000 Kilograms or More of Marijuana for Importation into the U.S., and Aiding and Abetting, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), (b)(1)(H), (b)(1)(A), (b)(1)(G), 963, and 18 U.S.C. § 2. Plea Agreement, ECF No. 72; Minute Entry (Apr. 3, 2018); *see also* Indictment, ECF No. 3. He was thereafter sentenced to 180 months of incarceration and 60 months of supervised release. *See* Judgment & Commitment, ECF No. 145. This sentence fell below guidelines range of 292 to 365 months, and was imposed because, among other things, defendant voluntarily extricated himself from the drug trade several years before his arrest, which was a mitigating factor as to both his culpability and the continued risk he posed to the public, and because defendant is a deportable person following his sentence, meaning that he is ineligible to reduce his time in prison through end-of-sentence reentry programs such as home confinement. (Sealed) Statement of Reasons ("SOR") at 5, ECF No. 146 (citing *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994)); Def.'s Sentencing Mem. at 3, 9-10 (explaining implications of defendant's immigration status and that he exited the drug trade after his father was killed in cartel-related violence); Gov't's Sentencing Mem. at 4 (acknowledging that the offense conduct ended in 2009). Defendant has been incarcerated since his arrest in Mexico in 2013 and subsequent extradition in 2015.[1]

---

[1]    In January 2024, defendant moved to apply retroactively amended sentencing guidelines pertaining to crack cocaine offenses, *see* Def.'s Mot. for Retroactive Application of Sentencing Guidelines to Crack Cocaine Offense, ECF No. 149, which motion was opposed by the government, *see* Gov't's Mem. in Opp'n to Def.'s Mot. for Retroactive Application, ECF No. 150. This motion was denied because defendant did not satisfy multiple criteria required, under U.S.S.G. § 4C1.1, for retroactive application of these amended rules. Minute Order (Apr. 4, 2024).

Defendant is now scheduled for release on July 25, 2026, and, since he is subject to an immigration detainer, will be then transferred to ICE custody for deportation.  Def.'s Mot. at 2. On March 8, 2026, defendant filed the instant motion for compassionate release.  *See* Def.'s Mot. Briefing for this motion was completed on April 20, 2026, *see* Gov't's Opp'n; Def.'s Reply, after defendant's request for an extension was granted, Def.'s Unopposed Mot. for Ext. of Time to File Reply, ECF No. 159; Minute Order (Apr. 14, 2026).

### C. Defendant's Medical Conditions

Defendant is 61 years old and incarcerated at the Federal Medical Center Rochester ("FMC Rochester"), though he is not housed in a medical unit there.  Def.'s Mot. at 10; Gov't's Opp'n at 2.  On June 30, 2025, he reported to the BOP health services unit that he had been experiencing abdominal pain, although to the nurse practitioner's understanding, this pain occurred "only . . . when running or doing abdominal exercises."  Gov't's Opp'n, Ex. B, Rubio-Perez Clinical Notes ("Clinical Notes") at 1, ECF No. 158.  The nurse practitioner recommended taking a break from running and posited that the pain was "most likely musculoskeletal . . . since [defendant] denied any pain at rest."  *Id.*  Importantly, at that visit and all subsequent medical appointments, defendant "was not offered any language interpretation services."  Def.'s Reply at 2.  Defendant attributes the lack of interpreter services, in part, to the March 1, 2025, revocation of Executive Order 13166, which had directed federal agencies to improve access to their federally conducted programs and activities for individuals for whom English is a second language.  Def.'s Reply at 1-2; Exec. Order 14224, Designating English as the Official Language of the United States, 90 Fed. Reg. 11363 (Mar. 1, 2025) (revoking Exec. Order 13166, Improving Access to Services for Persons with Limited English Proficiency, 65 Fed. Reg. 50121 (Aug. 11, 2000)).  After this revocation, the Department of Justice, of which BOP is a component, issued guidance instructing agencies to

"consider English-only services . . . where allowed by law."  Mem. from Att'y Gen. to All Fed. Agencies at 3 (July 14, 2025), https://www.justice.gov/ag/media/1407776/dl [https://perma.cc/6F7C-UFQ7] (capitalization altered).  BOP has not amended any formal regulations in response to these directives and neither party cites to BOP regulations regarding interpretation during medical visits, but whatever the cause, defendant did not receive interpreter services during critical medical appointments.

Approximately two months after this initial appointment, on September 4, 2025, he received a regular preventative health screening and was recorded as presenting "no current complaints."  Clinical Notes at 4.  On September 23, 2025, he returned to the health services unit with complaints of itching, jaundice, and dark urine, at which point the health services unit ordered blood tests and a follow-up appointment two days later.  *Id.* at 6-7.  When the blood tests "suggest[ed] cholestatic liver injury," *id.* at 9, and he continued to complain of the same symptoms along with abdominal pain, *id.* at 11, he was sent to the emergency department in the Mayo Clinic on September 25, 2025, where he was diagnosed with acute pancreatitis and obstruction of a bile duct, and underwent multiple surgeries, including one that removed his gallbladder, *id.* at 15.  To repeat, defendant was not provided with an interpreter at the hospital, and "[t]o this day . . . is not entirely clear on what type of surgery was performed on him."  Def.'s Reply at 2-3.  While at the hospital, he also received a CT scan of his chest, which identified nodules in his lungs measuring approximately 6 millimeters, which can be a warning sign for lung cancer.  Def.'s Mot. at 7.  He remained in the hospital for several days due to post-surgery complications.  *Id.* at 6.  After his October 5, 2025, release from the hospital, the health services unit ordered additional lab testing recommended by the hospital, Clinical Notes at 16-17, and on March 2, 2026, completed a follow up CT scan that showed that the nodules in his lungs remained stable in size, *id.* at 27.  On March

10, 2026, defendant attended a chronic care appointment with the health services unit where a doctor reviewed with him the results of blood tests taken on February 9, 2026. *Id.* at 19.

Defendant proffers an expert report by Dr. Linda M. Graves, M.D., a physician, whose qualifications are not challenged by the government, *see generally* Gov't's Opp'n, and who reviewed BOP medical records and offered her opinions on what further care defendant requires. *See* Def.'s Mot., Ex. 2, Dr. Linda M. Graves, M.D., Professional Evaluation of Medical Records of Def. ("Graves Report"), ECF No. 154-2. In addition to the information highlighted in the parties' briefing and the BOP clinical notes provided by the government, Dr. Graves notes that defendant has been diagnosed with "hyperlipidemia, peripheral vertigo, nocturnal polyuria, chronic rhinitis, lower back pain, . . . latent tuberculosis infection[,] . . . and dizziness." *Id.* at 10. Dr. Graves emphasizes that, due to defendant's recent surgery, he should receive follow ups "at monthly intervals for monitoring of his laboratory studies for at least one year," and that there should be a "low threshold for hospital evaluation should he develop abdominal pain." *Id.* at 11. As to his lung nodules, Dr. Graves recommends "a repeat CT scan of the chest in three to six months" following the initial diagnosis in September 2025, as well as a "follow up with a private pulmonologist every three months." *Id.* at 11-12.

## II.    LEGAL STANDARD

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (plurality opinion) (quoting 18 U.S.C. § 3582(c)). One such exception, created by the First Step Act of 2018, authorizes the court to "modify a term of imprisonment once it has been imposed . . . in any case" when a defendant files a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal

a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *United States v. Wilson*, 77 F.4th 837, 839 (D.C. Cir. 2023).

Upon satisfaction of the exhaustion requirement, a defendant's term of imprisonment may be reduced when the court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," finds, first, that "extraordinary and compelling reasons warrant such a reduction," and, second, "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).[2] The Sentencing Commission has promulgated a policy statement on reduction in terms of imprisonment (*i.e.*, compassionate release) under 18 U.S.C. § 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13 ("policy statement").[3] The policy statement incorporates the FSA's statutory requirements for compassionate release, including that the court consider the § 3553(a) factors and find extraordinary and compelling reasons for release, *id.* at § 1B1.13(a), (a)(1)(A), and adds the

---

[2]    As an alternative to showing "extraordinary and compelling reasons" for compassionate release, a defendant may instead show that he "is at least 70 years of age, has served at least 30 years in prison . . . for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community." 18 U.S.C. § 3582(c)(1)(A)(ii). This provision is inapplicable here due to defendant's age and time served, so is not discussed.

[3]    Defendant asserts that "§ 1B1.13 is not binding on defendant-filed motions," citing *United States v. Long*, 997 F.3d 342, 345 (D.C. Cir. 2021), but argues that "district courts may nonetheless rely on the policy statement and its commentary as persuasive authority," and relies heavily on the policy statement. Def.'s Mot. at 4. The D.C. Circuit held in *Long* that the FSA requires courts to "apply any 'applicable policy statements' issued by the Sentencing Commission" but that U.S.S.G. § 1B1.13 as then written was "not 'applicable' to defendant-filed motions for compassionate release under the First Step Act." 997 F.3d at 355. At the time, "[b]y its terms, the policy statement applie[d] only to motions for compassionate release filed by the Bureau of Prisons, not by defendants," and the Sentencing Commission had "never suggested that its existing policy statement applies to defendant motions under the First Step Act" and "ha[d] issued no policy statement applicable to the First Step Act because it has lacked a quorum since shortly after that Act's passage." *Id.* In 2023, however, the Sentencing Commission revised § 1B1.13 to apply to motions "of the Director of the Bureau of Prisons or the defendant pursuant to [the First Step Act]," thereby making this policy statement applicable to defendant-filed motions for compassionate release. U.S.S.G. § 1B1.13(a); U.S.S.G. amend. 814 (Nov. 1, 2023). Although the D.C. Circuit has not revisited § 1B1.13 since the revision, the plain text of the FSA counsels that compassionate release motions must be granted only if consistent with applicable Sentencing Commission policy statements, and the 2023 revision rendered § 1B1.13 applicable to defendant-filed motions. Consistency with § 1B1.13 is therefore a prerequisite to compassionate release.

requirement that the defendant must "not [be] a danger to the safety of any other person or to the community," *id.* § B1B.13(a)(2).  Finally, the policy statement provides detailed guidance on certain possible "extraordinary and compelling reasons" for release, such as medical conditions, *id.* § B1B.13(b)(1), family circumstances, *id.* § B1B.13(b)(3), or abuse while incarcerated, § B1B.13(b)(4), while also including a catchall provision, which dictates that extraordinary and compelling reasons may exist when "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in [the policy statement], are similar in gravity to those described in [the policy statement]," *id.* § B1B.13(b)(5); *see United States v. Carroll*, No. 20-cr-16 (JEB), 2025 WL 2061669, *4 (D.D.C. July 23, 2025) (noting that "catchall" provision can encompass circumstances not otherwise enumerated).

### III.    DISCUSSION

Here, the parties do not dispute that defendant has exhausted his administrative remedies, since he sent a letter more than 30 days ago to the warden of FMC Rochester requesting compassionate release but received no response.  *See* Gov't's Opp'n at 4 ("The Government does not dispute that Rubio Perez has exhausted his administrative remedies.").  The parties disagree, however, about whether defendant's medical conditions constitute extraordinary and compelling reasons for a reduction of sentence, in a manner consistent with the U.S. Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13, and about whether the § 3553(a) factors counsel release.  Additionally, defendant contends that he "is not a danger to the safety of any other person or to the community," *id.* § B1B.13(a)(2); *see also* Def.'s Mot. at 13, an issue the government does not address.  Since findings that (1) extraordinary and compelling reasons justify release, (2) the § 3553 factors favor early release, and (3) the defendant does not pose a danger to others, are each required to grant defendant's motion, each is considered in turn.

8

### A.  Extraordinary and Compelling Circumstances

Defendant argues that his medical conditions, including acute pancreatitis, recovery from gallbladder removal, lung nodules, and various other conditions, constitute extraordinary and compelling reasons for an early release, while the government disputes that these medical conditions justify such action.  *See* Def.'s Mot. at 5; Gov't's Opp'n at 5-6.  The policy statement specifies that, in some cases, medical conditions may constitute extraordinary and compelling reasons for reduction of a sentence.  *Id.* § B1B.13(b)(1).  Relied upon here by defendant, extraordinary and compelling reasons exist where the "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id.* § B1B.13(b)(1)(C).[4]

This provision of the policy statement encompasses three elements: (1) that defendant identify a medical condition requiring long-term or specialized care; (2) that such care is not being provided; and (3) that the lack of care risks the defendant's health or death.  The government does not appear to dispute that acute pancreatitis or lung nodules, along with defendant's other conditions, are medical conditions requiring long-term or specialized care, or that his life or health may be in danger if such care is not provided.  *See* Gov't's Opp'n at 7-9.  Instead, the government argues that defendant has not shown that such care "is not being provided." *Id.*

Defendant has produced evidence of serious gaps in the medical care he has received while incarcerated.  Most significantly, he "was not offered any language interpretation services" at medical visits, limiting his ability to communicate his symptoms to medical staff, to understand

---

[4]    Defendant also invokes the provision of the policy statement that medical conditions may be an extraordinary and compelling reason for release when the "defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § B1B.13(b)(1)(B).  Since the defendant's lack of access to care justifies compassionate release, this provision is not considered.

the treatment options or even to understand precisely what treatment he received or may need in the future. *See* Def.'s Reply at 2. His abdominal pain then went untreated for three months, until he was experiencing severe additional symptoms like jaundice and dark urine and returned lab tests indicating "cholestatic liver injury." *Id.*; *see* Clinical Notes at 1, 9. The health services unit attributed his initial abdominal pain to "musculoskeletal" issues because he "denied any pain at rest," Clinical Notes at 1, but given that the appointment was conducted without language interpretation services, this characterization of his symptoms may be inaccurate or incomplete, especially given that within three months he required surgery to remove his gallbladder, Def.'s Mot. at 6. Due to the risk of reoccurrence of defendant's pancreatitis, Dr. Graves recommends, among other things, that there be a "low threshold for hospital evaluation" if defendant begins experiencing symptoms again, Graves Report at 11, but defendant has produced sufficient evidence that BOP staff, including those at the health services unit, may be unable effectively to understand and act on complaints from defendant. For instance, in addition to the BOP's long timeline for providing serious evaluation of defendant's abdominal pain, defendant also reports that "no language interpretation services were provided" at the hospital prior to his surgery, such that "emergency medical services were given without obtaining any informed consent" and "[t]o this day," defendant "is not entirely clear on what type of surgery was performed on him," leaving a foot-long scar on his abdomen. Def.'s Reply at 2-3. Defendant is rightly concerned that he will not receive the care he needs to avoid death or serious deterioration of his health—or have the opportunity to decide what care he wants—due to the BOP's refusal to provide him with interpretation services. That, combined with the risk of relapse of his acute pancreatitis and his

10

age, constitute extraordinary and compelling reasons to expedite his release from BOP custody by twelve weeks.[5]

### B. Factors under 18 U.S.C. § 3553

Even when defendant has shown an extraordinary and compelling reason for early release, the FSA directs that compassionate release may be granted only after consideration of the sentencing factors in 18 U.S.C. § 3553(a).  18 U.S.C. § 3582(c)(1)(A).  These factors include: (1) "the nature and circumstances of the offense"; (2) "the history and characteristics of the defendant"; (3) "the need for the sentence imposed" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (4) "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission"; (5) and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* § 3553(a).

Certainly, the nature of the offense was serious, involving tonnage quantities of marijuana and hundreds of kilograms of cocaine, and defendant was the leader of a DTO responsible for this trafficking.  *See supra* Part I.A.  Notably to his personal characteristics, however, he extricated himself from drug trafficking years prior to his arrest, *id.*, and this suggests that he has made strides toward a law-abiding life and reasons to be optimistic about his continued law-abiding conduct

---

[5] Defendant's acute pancreatitis, under the conditions discussed, alone provides an extraordinary and compelling reason to justify his release.  Defendant also points to his lung condition, despite which he has never "been evaluated by a pulmonologist," nor has "a pulmonology evaluation even been recommended."  Def.'s Mot. at 7-8.  This concern bolsters defendant's claim for compassionate release.

after release, despite the seriousness of his crimes.  Immediately prior to his arrest in Mexico, he was "gainfully employed as a rancher and farmer," Def.'s Mot. at 10, and upon his release he plans to "secure employment as an accountant working with his wife," with whom he has stayed in touch, along with his children, *id.* at 14.

Turning to the need for punishment, deterrence, alignment with the Sentencing Guidelines, and to avoid unwarranted sentencing disparities, defendant has less than twelve weeks left of incarceration.  Def.'s Mot. at 2.  Any effect on deterrence—specific or general—or the appropriateness of punishment would be minimal, given that defendant was arrested more than a decade ago and has been incarcerated ever since.  *See* Arrest of Def.  To the extent this slightly early release would create sentencing disparities, these are not "unwarranted" because defendant's health and lack of access to interpretation services make the remaining twelve weeks of incarceration riskier to his health and well-being than for others.  Significantly, after release from BOP custody, he "will be transferred to the custody of Immigration and Customs Enforcement and will be subject to mandatory deportation to Mexico."  Def.'s Mot. at 14.  Any period of ICE detention following his release from BOP custody is not counted toward his sentence, and risks further prolonging his lack of access to appropriate medical care where he can fully communicate with medical providers.

Finally, the "need . . . to provide the defendant with . . .  medical care . . . in the most effective manner" also counsels for release, for the reasons discussed *supra* in Part III.A.

### C.  Danger to Others or the Community

Finally, the policy statement requires that compassionate release be granted only if defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," U.S.S.G. § B1B.13(a)(2), which lays out factors for evaluating

dangerousness including, as relevant here, "the nature and circumstances of the offense," "the history and characteristics of the person," and the "nature and seriousness of the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g). Defendant argues that "[e]very one of these factors weighs against a finding of dangerousness," Def.'s Mem. at 13, and the government offers no response, *see generally* Gov't's Opp'n.

For much the same reasons that the factors under 18 U.S.C. § 3553(a) cut in favor of release, § 3142(g) cuts against a finding of dangerousness. Most significantly, defendant left the drug trade years before his arrest, reducing the likelihood that he would return to criminal activity upon release. He is also in poor health and has a loving family waiting to help him reintegrate. Def.'s Mot. at 14. These factors, too, reduce the chances that defendant would again involve himself in the dangerous drug industry.

\* \* \*

In sum, defendant has shown that extraordinary and compelling reasons justify his release; that the § 3553(a) factors support release; and that he poses no danger to the community or to any other person. BOP's failure to provide interpretation services during medical appointments, while concerning, alone would not justify compassionate release; rather, compassionate release is appropriate here due to the specific risks posed to defendant by his medical conditions and inability to communicate with medical staff, his cessation of offense conduct prior to arrest, the very short remaining time in his sentence, and the variety of factors that reduce the risk that he will pose a danger to others. These circumstances, taken together, warrant grant of his motion for compassionate release.

## IV.     CONCLUSION

For the foregoing reasons, defendant's Motion for Compassionate Release, ECF No. 154, is **GRANTED** and the Bureau of Prisons is **DIRECTED** to release defendant from BOP custody promptly.     An order consistent with this Memorandum Opinion will be published contemporaneously.

Date:  May 4, 2026

_____
**BERYL A. HOWELL**
United States District Judge

14